TRACY L. WILKISON
Acting United States Attorney
BRANDON D. FOX
Assistant United States Attorney
Chief, Criminal Division
IAN V. YANNIELLO (Cal. Bar No. 265481)
Assistant United States Attorney
International Narcotics,
    Money Laundering and Racketeering Section
    1400 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3667
    Facsimile: (213) 894-0141
    E-mail:    ian.yanniello@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | 8:20-cr-00088-JLS |
|---|---|
| Plaintiff, | GOVERNMENT'S SENTENCING POSITION REGARDING KAIS MOHAMMAD |
| v. | |
| KAIS MOHAMMAD, | Hearing Date: May 28, 2021 |
| Defendant. | Hearing Time: 9 a.m. |

Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Ian V. Yanniello, hereby files its sentencing position.

This sentencing position is based upon the attached memorandum

///

///

of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: May 7, 2021					Respectfully submitted,

							TRACY L. WILKISON
							Acting United States Attorney

							BRANDON D. FOX
							Assistant United States Attorney
							Chief, Criminal Division

							_____
							IAN V. YANNIELLO
							Assistant United States Attorney

							Attorneys for Plaintiff
							UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                              PAGE

TABLE OF AUTHORITIES..................................................ii
MEMORANDUM OF POINTS AND AUTHORITIES...................................1
I.   INTRODUCTION......................................................1
II.  BACKGROUND ON CRYPTOCURRENCY MONEY LAUNDERING.....................2
     A.   Unlicensed Money Transmitting Businesses.....................2
     B.   Background on Cryptocurrency and the Dark Web................4
III. FACTUAL BACKGROUND................................................6
     A.   Defendant's Illicit Crypto-Exchange Business.................6
     B.   Transactions with Undercover Agents..........................9
IV.  APPLICABLE GUIDELINES RANGE......................................10
V.   DEFENDANT SHOULD BE SENTENCED TO 46 MONTHS' INCARCERATION.......10
VI.  CONCLUSION.......................................................12

**TABLE OF AUTHORITIES**

DESCRIPTION                                                              PAGE

Cases

United States v. Murgio,
  209 F. Supp. 3d 698 (S.D.N.Y. 2016) ................................ 2

Statutes

18 U.S.C. § 1956 ..................................................... 2
18 U.S.C. § 1960 ..................................................... 2
18 U.S.C. § 3553 ................................................. 1, 10
31 U.S.C. § 5318 .................................................. 2, 3
31 U.S.C. § 5330 ..................................................... 2


Regulations

31 C.F.R. § 1022.210(a) .............................................. 3
31 C.F.R. § 1010.311 ................................................. 3
31 C.F.R. § 1022.380(b)(2) ........................................... 3
31 C.F.R. § 1022.320(a)(2) ........................................... 3

**MEMORANDUM OF POINTS AND AUTHORITIES**

**I.   INTRODUCTION**

Defendant Kais Mohammad ("defendant") owned and operated an illegal virtual-currency exchange business called "Herocoin" for five years. As a former bank employee who trained others in compliance procedures, defendant was fully aware of the applicable law, including that he register his business with FinCEN and that he implement and maintain an effective anti-money laundering ("AML") program. Rather than use his knowledge to create a robust compliance program, defendant avoided one altogether and profited by making his business an efficient, unchecked, and nearly anonymous conduit for money laundering and other crimes. Additionally, defendant charged high commission rates and essentially promoted the noncompliant features of his business, including that customers could even conduct money transactions without identification. In total, the business generated transactions valued at over $15,000,000.

The government seeks a sentence that sanctions defendant's criminal behavior and sends a message of deterrence – but one that also reflects the mitigating circumstances present here. The government is in agreement with the criminal history and offense level calculations of the Presentence Investigation Report ("PSR") as well as its factual findings. In accordance with the U.S. Probation Office's recommendation, the government respectfully submits that a sentence of 46 months is appropriate, just, and necessary to accomplish the goals set forth in 18 U.S.C. § 3553(a).

**II.   BACKGROUND ON CRYPTOCURRENCY MONEY LAUNDERING**

   **A.   Unlicensed Money Transmitting Businesses**

18 U.S.C. § 1960[1] criminalizes, in relevant part, money transmitting businesses that fail to comply with federal registration requirements, as required by 31 U.S.C. § 5330 and the regulations prescribed thereunder. Section 1960 was enacted in 1992 as part of the Annunzio-Wylie Anti-Money Laundering Act, which was one of a series of provisions aimed at combating money laundering and enhancing reporting requirements relating to cash transactions. A more complete explanation of the purpose of the legislation is in the report of the Senate Banking Committee on the bill in the prior session of Congress. See S. Rep. No. 101-460, 101st Cong., 2d Sess. (1990). That Senate Report noted that, as banks' compliance with money laundering legislation has improved, "[i]ncreasingly, money launderers are using money transmitters, check cashers, money exchanges and other nonbank financial companies" to "convert street currency into monetary instruments and even to transmit abroad the proceeds of drug sales." Id. at 13-14. "From its inception," Section 1960 "sought to prevent innovative ways of transmitting money illicitly." United States v. Murgio, 209 F. Supp. 3d 698, 708 (S.D.N.Y. 2016).

A money transmitting business like Herocoin must register with the federal government as a "money services business" ("MSB"), specifically, with the Financial Crimes Enforcement Network ("FinCEN"), which is part of the Department of Treasury. 31 C.F.R. § 1022.380(b)(2). Registration

---

[1] On September 29, 2020, defendant pled guilty to a three-count information, which charged defendant with violations of 18 U.S.C. § 1960(a) (Operating an Unlicensed Money Transmitting Business), 18 U.S.C. § 1956(a)(3)(B) (Money Laundering), and 31 U.S.C. §§ 5318(h), 5322(a) (Failure to Maintain an Effective AML Program).

2

as a MSB then triggers obligations for that business. For example, under the Bank Secrecy Act, an MSB is required, among other things, generally to:

- Develop, implement, and maintain an effective written anti-money laundering program that is reasonably designed to prevent the MSB from being used to facilitate money laundering and the financing of terrorist activities (31 U.S.C. §§ 5318(a)(2), (h); 31 C.F.R. § 1022.210(a));
- Report transactions that the MSB knows, suspects, or has reason to suspect are suspicious (which includes funds derived from illegal activity or involves the use of the transmitter to facilitate criminal activity), if the transactions are conducted or attempted by, at, or through the MSB, and the transactions involve or aggregate to at least $2,000 in funds or other assets (31 U.S.C. § 5318(g)(1); 31 C.F.R. §§ 1022.320(a)(2)); and
- File a report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to such MSB which involves a transaction in currency of more than $10,000 (31 C.F.R. § 1010.311).

In practice, the obligations outlined above require an MSB to verify customer identity, conduct due diligence on its customers, file reports with the federal government, and create and maintain records pursuant to the Bank Secrecy Act. When MSBs are not registered with the federal government, they are not routinely subject to examinations (i.e., audits) conducted by FinCEN to ensure that these obligations are being followed, and have no incentive to comply with the requirements of the Bank Secrecy Act. Unregistered MSBs thus operate in, and fuel, a black market financial system, and

pose the very threats that the Senate outlined in legislating 18 U.S.C. § 1960.

### B. Background on Cryptocurrency and the Dark Web

Digital currency (also known as crypto-currency or virtual currency) is generally defined as an electronic-sourced unit of value that can be used as a substitute for fiat currency (i.e., currency created and regulated by a government). Cryptocurrency exists entirely on the Internet and is not stored in any physical form. Cryptocurrency is not issued by any government, bank, or company and is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Cryptocurrency is not illegal in the United States and may be used for legitimate financial transactions. However, because of the "pseudonymous" nature of cryptocurrency (described below), it is used for conducting illegal transactions, such as the sale of controlled substances.

"Bitcoin" (or "BTC") is a type of cryptocurrency that allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems. Bitcoins are a decentralized form of cryptocurrency having no association with banks or governments. Users store their Bitcoins in digital "wallets," which are identified by unique electronic "addresses." A digital wallet essentially stores the access code that allows an individual to conduct Bitcoin transactions on the public ledger. To access Bitcoins on the public ledger, an individual must use a public address (or "public key") and a private address (or "private key"). The public address can be analogized to an account number while the private key is like the password to access that account. Even though the public addresses of those engaging in Bitcoin transactions are

4

recorded on the public ledger, the "Blockchain," the true identities of the individuals or entities behind the public addresses are not recorded.  If, however, a real individual or entity is linked to a public address, it would be possible to determine what transactions were conducted by that individual or entity.  Bitcoin transactions are, therefore, described as "pseudonymous," meaning they are partially anonymous.

Although legal and with legitimate use, Bitcoin is used by criminals for money-laundering purposes, and are believed to be the currency of choice for payment for illegal goods and services on "dark web" websites.  "Dark web" websites is a colloquial term for sophisticated, encrypted websites that allow participants to buy and sell illegal items, such as drugs, firearms, and other hazardous materials (sold by "vendors") with greater anonymity than the traditional Internet.  These online black market websites use a variety of technologies, and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring, and usually only accept digital currencies such as Bitcoin as a form of payment for contraband.  A famous dark web marketplace, Silk Road (which law enforcement shut down in 2013), operated similar to legitimate commercial websites such as Amazon and eBay, but offered drugs, guns, poisons, and other illicit goods and services.

Generally, individuals can purchase or sell Bitcoin in a peer-to-peer context (i.e., another individual willing to exchange Bitcoin for cash) or from exchange companies.  Those offering to exchange Bitcoin for cash in a peer-to-peer setting often advertise their services on the Internet, on websites such as localbitcoins.com or

Craigslist.  Bitcoin exchangers either comply with the law, and register with the government and implement anti money-laundering controls (like traditional banks), or choose not to register with the federal government, thereby seeking to avoid the requirements imposed by the Bank Secrecy Act (described above).

In the government's experience with criminal investigations, those who obtain and use digital currency via and through illicit means seek to exchange this currency for fiat currency via unregistered financial exchangers to remain outside government scrutiny.  That is to say, illicit actors prefer exchanging their Bitcoin for fiat currency (or vice versa) through institutions that do not require a form of identification or report certain transactions to the federal government.  This method of exchanging allows illicit actors to exploit some of the features of cryptocurrency and remain as anonymous as possible.

### III. FACTUAL BACKGROUND

#### A.   Defendant's Illicit Crypto-Exchange Business

Defendant operated Herocoin from in or around December 2014 until agents executed search warrants and seized his network of "Bitcoin ATMs" (hereafter, "BMTs") in November 2019.  As part of this business, defendant offered Bitcoin-cash exchange services for a commission that was substantially higher than market rate.  (PSR ¶¶ 13, 21.)  Defendant offered these services, in person and through his BTMs throughout the Central District of California.

Defendant knew, from essentially the inception of his business, that he was required to register with FinCEN as a money services business.  (PSR ¶ 22.)  In 2009, defendant was an employee for a bank, and as a personal banker, was responsible for training others

6

on compliance procedures. (PSR ¶ 22.) He was also specifically aware of the compliance requirements for exchangers of virtual currencies such as himself and his BTM network. (PSR ¶ 22.) For example, in January 2015, defendant certified to the manufacturer of the BTMs that defendant purchased that he was aware of the applicable guidelines from FinCEN. (PSR ¶ 23.) During this time, he was aware that he was required to develop and maintain an effective AML program, file currency transaction reports for exchanges of currency (including Bitcoin) in excess of $10,000, conduct due diligence customers, and file suspicious activity reports for transactions over $2,000 which he knew, suspected, or had reason to suspect that the transaction involved use of his business to facilitate criminal activity. (PSR ¶ 23.) Defendant knew of these requirements, and intentionally did not comply with them. In fact, defendant embraced his company's AML failures to profit, including promoting that his BTM machines did not require any form of identification.



(USAO_000223 [Red Boxes Added].)

After FinCEN directly contacted defendant in July 2018 about the need to register, defendant registered as a money services business on or about July 16, 2018. (PSR ¶ 24.)  However, even after registering, defendant continued to defy the requirements of the Bank Secrecy Act, including maintaining an effective AML program, filing certain reports, and conducting due diligence on customers. (PSR ¶ 24.)  Furthermore, even after registering with FinCEN, defendant continued to conduct in-person exchanges, and allowed BTM transactions to occur, with customers who either represented the proceeds to be of an illicit nature (as described below) or with whom he had reason to believe were dealing in illicit businesses. (PSR ¶ 24.)  For example, in or around April and May 2019, defendant conducted in-person Bitcoin-cash transactions with an individual who informed him that "[b]usiness has been slow [because of] dark web going under maintenance." (PSR ¶ 25.)  Defendant never obtained the identification of this individual or filed a suspicious activity report, and continued to do business with this individual. (PSR ¶ 25.)  And in many occasions, including in transactions with undercover agents (described below), defendant knew that the funds he was exchanging were proceeds (or represented to be proceeds) of illicit activity. (PSR ¶ 24.)

Through his failure to implement a functioning AML program, defendant allowed significant and suspicious transactions to occur at his BTMs and during in-person exchanges. (PSR ¶ 28.)  For example, defendant failed to get full customer identification through his BTMs, including those who were involved in illicit activities, such as the dark web, and the undercover agents who represented themselves to be involved in illegal activities.  Customers were also able to

8

conduct multiple transactions at BTMs of up to $3,000 without providing identification cards, and customers could use multiple BTMs operated by defendant (none of which had a camera or other way to ensure that any identification provided was the person conducting the transaction) without being recognized, or vetted, by defendant. (PSR ¶ 29.)

**B.   Transactions with Undercover Agents**

Agents with Homeland Security Investigations ("HSI") conducted the following transactions with defendant and/or his BTM:

- On September 12, 2018, an agent with HSI obtained a total of $14,500 worth of Bitcoin at a BTM in Lakewood, California, structured in three transactions (since the maximum limit was $5,000 cash per transaction). All three transactions happened successively on and on the same day. The machine did not ask the agent for identification. Defendant never filed a currency transaction report for this overall transaction.
- Between February and August 2019, defendant conducted in-person transactions with agents of HSI, who represented cash that they sought to exchange with defendant were proceeds of illegal activity. Defendant conducted three transactions with the undercover agents, in the following amounts: $25,000, $15,000, and $16,000. During a meeting on July 25, 2019, one of the HSI undercover agents informed defendant that he worked at a "karaoke bar," and that the operator of the "karaoke bar" employed women from Korea to entertain men in various ways, including sharing drinks, acting like their "girlfriends," and engaging in sexual activity. The represented proceeds of that activity, which defendant understood to be from activity in

9

|   |   |
|---|---|
| 1 | connection with the "karaoke bar," were in cash, which the |
| 2 | undercover agent sought to exchange into Bitcoin.  On August 28, |
| 3 | 2019, defendant met with that same undercover agent, and |
| 4 | exchanged $16,000 in cash for approximately 1.58592 Bitcoin. |
| 5 | Defendant never filed a currency transaction report or |
| 6 | suspicious activity report for these transactions.  Defendant |
| 7 | also never obtained the identification of the HSI agents with |
| 8 | whom he transacted. |

**IV.  APPLICABLE GUIDELINES RANGE**

The parties agree with USPO's guidelines calculation, which follow the plea agreement.  Before any departures, the applicable guidelines range is 25, resulting in an advisory guidelines range of 57 to 71 months.  The U.S. Probation Office recommends a custodial sentence of 46 months, followed by a two-year term of supervised release.

**V.   DEFENDANT SHOULD BE SENTENCED TO 46 MONTHS' INCARCERATION**

The government submits that a 46-month sentence is appropriate and just in light of the nature of the conduct, the need for specific and general deterrence, and the characteristics of the defendant. See 18 U.S.C. § 3553(a).

The nature of the underlying conduct is aggravating and warrants a serious sanction.  Money laundering is a pernicious crime, as the repatriation and concealment of illicit proceeds allows, and incentivizes, criminal actors to profit and continue their activities without disruption from the government.  Here, defendant knew about the applicable regulations governing his money exchange business and purposefully flouted them to create a business that would make money laundering easier -- not harder.  Indeed, defendant was a former

banker who trained others on BSA requirements, but nonetheless operated a business that created an efficient, unchecked, and nearly anonymous conduit for money laundering.

While the scope of criminal conduct that defendant enabled by transacting business exceeding $15 million is unknown, the dangers posed by his conduct are obvious and must be deterred. The recommended sentence is needed to ensure that defendant does not resort to this activity again. Further, the recommended sentence will also send a message to the community at large – particularly those engaged in the business of cryptocurrency exchange and operation of BTMs. Such a sentence will send a signal that violations of the Bank Secrecy Act are taken seriously; in this case, defendant paid no attention to the crucial reporting requirements that were imposed on his significant, high-volume business in the course of nearly five years, and such conduct should be punished. Imposing a sanction on the cryptocurrency exchanger – who serves as the sole gateway for criminals who have illicit digital currency to get cash – will hopefully deter others to comply with AML laws. That, in turn, will hopefully also affect those who are committing the underlying offenses generating illicit proceeds in the form of cryptocurrency.

While the government believes that a custodial sentence is necessary to reflect the goals of sanctioning criminal conduct and achieving deterrence, the mitigating factors here justify the government's requested sentence of 46 months. First and foremost, after agents executed search warrants in this case, defendant immediately cooperated law enforcement, which suggests that he is a lower risk of recidivism. The government also notes the medical

11

issues discussed in the PSR and defendant's filings, which further justify the recommended sentence.

## VI. CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant to 46 months' incarceration, to be followed by two years of supervised release. The government also requests an order of forfeiture reflecting the currency, digital currency, and BTMs seized on or about November 20, 2019.