Michael A. Goldstein     SBN 183555
GOLDSTEIN LAW GROUP
1645 Vine Street, Suite 809
Los Angeles, California 90028
Telephone:  323-461-2000
Facsimile:   323-446-7372
mg@goldsteinlawgroup.com

Hagop Kuyumjian     SBN 259995
THE KUYUMJIAN FIRM, APC
515 S. Flower Street, Suite 1900
Los Angeles, California 90071
Telephone:  213-785-3207
Facsimile:   213-236-3781
hk@tkflaw.com

Attorneys for Defendant
KAIS MOHAMMAD

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>KAIS MOHAMMAD,<br><br>Defendant. | Case No. 8:20-CR-00088-JLS<br><br>**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION** |

TO    TRACY L. WILKISON, ACTING UNITED STATES ATTORNEY FOR THE CENTRAL DISTRICT OF CALIFORNIA; BRANDON FOX, ASSISTANT UNITED STATES ATTORNEY, CHIEF, CRIMINAL DIVISION; AND IAN YANNIELLO, ASSISTANT UNITED STATES ATTORNEY:

TO    THE CLERK OF THE COURT:

1    Defendant, Kais Mohammad, through his counsel of record, hereby files his
2    reply to the Government's sentencing position.

3

4    DATED:  May 14, 2021                    GOLDSTEIN LAW GROUP

5

6                                            /s/
                                            MICHAEL A. GOLDSTEIN
7                                           Attorney for Defendant
                                            KAIS MOHAMMAD
8

9                                           THE KUYUMJIAN FIRM, APC

10

11                                           /s/
                                            HAGOP KUYUMJIAN
12                                          Attorney for Defendant
                                            KAIS MOHAMMAD
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES………………………………………………………………iv

I.    INTRODUCTION…………………………………………………………………1

II.   THE FACTS IN THIS CASE CALL FOR THE DEFENSE SENTENCING
      RECOMMENDATION TO BE IMPOSED……………………………………2

      A. Bitcoin Has a Wide Variety of Legitimate Uses……………………………2

      B. Kais Was Operating Openly and Publicly…………………………………..3

      C. Not All of Kais's Customers Engaged in Illegal Activity……………………4

      D. Kais Did Not Seek to Join the Undercover Agents in Illegal Activity………5

      E. The Government's Sentencing Recommendation Imposes Too High a
         Consequence for the Conduct in this Case……………………………………5

           i.   The Loss Range is the Majority of the Total Offense Level…………5

           ii.  A Probationary Sentence Adequately Addresses Concerns of
                Punishment and Deterrence…………………………………………...6

           iii. Society Benefits from a Noncustodial Sentence………………………8

           iv.  The Government Does Not Adequately Consider the Mitigating
                Information……………………………………………………………8

           v.   The Government's Sentencing Recommendation is Inconsistent with
                Other Cases Involving Similar Charges………………………………9

III.  CONCLUSION…………………………………………………………………...11

DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION

1

# TABLE OF AUTHORITIES

2

3 **CASES**

4 *Gall v. United States*, 552 U.S. 38 (2007)……………………………………………..6

5 *United States v. Ruff*, 535 F.3d 999 (9th Cir. 2008)…………………………………6

6 *United States v. Whitehead*, 532 F.3d 991 (9th Cir. 2008)…………………………....7

7

8 **REFERENCED CASES**

9 *United States v. Kalra*, Case Number 2:19-CR-00484-PSG-1…………………...10, 11

10 *United States v. Neman*, Case Number 2:14-CR-00521-JAK…………………9, 10, 11

11 *United States v. Tetley*, Case Number 2:17-CR-00738-R………………………...10, 11

12

13 **STATUTES**

14 18 U.S.C. § 3553……………………………………………………………....5, 7, 9

15

16 **UNITED STATES SENTENCING GUIDELINES**

17 U.S.S.G. § 2B1.1……………………………………………………………………5

18

19 **OTHER AUTHORITY**

20 Andreessen, Mark, "Why Bitcoin Matters," New York Times, 1/21/14

21 (https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/)……………………..2

22

23 Haqqi, Ty, "15 Biggest Companies That Accept Bitcoin," Yahoo! Finance, 2/18/21

24 (https://finance.yahoo.com/news/15-biggest-companies-accept-bitcoin-

25 165115491.html)...............................................................................................................3

26

27

28

**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## REPLY TO THE GOVERNMENT'S SENTENCING POSITION

### I.

### INTRODUCTION

This Court should follow the defense's sentencing recommendation and sentence Defendant Kais Mohammad ("Kais") to a noncustodial term of probation or in the alternative, a custodial term of one year and one day. This sentence properly reflects the interests of justice while taking into account society's interests and deterrence. The Government's recommendation should be rejected as it imposes too high a price on Kais, a nonviolent, first-time offender.

Kais fully accepts responsibility and does not seek to minimize his conduct. He has lived in remorse ever since the onset of this matter. However, the law requires that he be punished in a manner equal to his conduct. The Government's sentencing recommendation does not accomplish this objective and is inconsistent with sentences in other cases with similar or more serious charges.

Moreover, the Government does not adequately consider the extraordinary mitigating circumstances present for Kais. He is the primary and irreplaceable caregiver for his wife and two minor children. Kais is also responsible for looking after his mother and maintaining his family unit. Without Kais, the family will be irreparably broken. Kais is also suffering from mental health issues that will only be exasperated with an extended custodial sentence.

Kais understands the nature of his conduct and acknowledges that he did not comply with the law. He recognizes that he must be punished but respectfully requests that the Court treat him with mercy because he is a first-time offender who is not accused of directly harming anyone. For these reasons and those specified below, the Court should sentence Kais to probation or in the alternative, to no more than one year and one day in prison.

## II.

## THE FACTS IN THIS CASE CALL FOR THE DEFENSE SENTENCING RECOMMENDATION TO BE IMPOSED.

Kais acknowledges that he did not initially register with Financial Crimes Enforcement Network ("FinCEN") and did not comply with the Bank Secrecy Act. However, Kais did not defraud anyone, physically harm anyone, steal from anyone, or mislead anyone. He was also not directly involved in any dark web activity and did not conduct Bitcoin ("BTC") transactions on the dark web. He simply exchanged United States currency for cryptocurrency without following the applicable regulations and not vetting his customers.

The profits Kais made were minimal due to the large overhead costs, massive volatility of BTC, and other expenses. Further, Kais is not alleged to have been present for any of the illicit activity perpetrated by his customers.

### A.    Bitcoin Has a Wide Variety of Legitimate Uses.

BTC was developed as a tool to safely and securely allow people to exchange currency quickly and efficiently. [1] It was introduced with the goal of allowing people to send money without dealing with the hardships, delays, and complications associated with standard banking. This primary and legitimate quality is the driving force behind the meteoric rise in BTC's value.

The "pseudonymous" nature of BTC should not sway this Court because standard hand-to-hand cash transactions have the same quality. Like email, BTC is traceable. "Further, every transaction in the Bitcoin network is tracked and logged forever in the Bitcoin blockchain, or permanent record, available for all to see. As a result, Bitcoin is considerably easier for law enforcement to trace than cash, gold, or diamonds." The criticism that BTC is a haven for bad behavior or that it allows

---

[1] Information the first two paragraphs regarding BTC is taken or quoted from Andreessen, Mark, "Why Bitcoin Matters," New York Times, 1/21/14 (https://dealbook.nytimes.com/2014/01/21/why-bitcoin-matters/).

criminals to operate with impunity has been described as a "...myth, fostered mostly by sensationalistic press coverage and an incomplete understanding of the technology."

As BTC and other cryptocurrencies have grown in popularity and value, many major companies have begun to accept them as a form of payment. Examples of such companies include Rakuten, Inc., Whole Foods Market, Inc., PayPal Holdings, Inc., Etsy, Inc., Overstock.com, Inc., and Coca-Cola Amatil Limited.[2]

Kais stumbled into the BTC trading business with the belief that it would one day grow into a legitimate source of income for his young family. He did not deal with the dark web and should not be harshly penalized because of the chance that BTC can be used for illicit purposes on the dark web. He is also not accused of exchanging BTC for individuals engaged in violent crimes or exchanging BTC for anything other than United States currency. Kais saw the enormous growth potential of the BTC business and was right that it could be profitable. However, he did not follow the applicable guidelines and now understands he should have registered while maintaining adequate anti-money laundering ("AML") safeguards. He has learned from these mistakes and is eager to make an honest living free of illegal behavior in the future.

**B.    Kais Was Operating Openly and Publicly.**

During the time Kais was operating "Herocoin," he was conducting business in the open and not engaging in clandestine activities. He was providing his real name when asked, was meeting customers in public places like Starbucks, and was not using code words. He was also direct about his commission rates and obtained a customer's agreement before charging a given commission. Kais did not trick anyone into paying an unexpected commission and did not use BTC to defraud anyone.

---

[2] Information from Haqqi, Ty, "15 Biggest Companies That Accept Bitcoin," Yahoo! Finance, 2/18/21 (https://finance.yahoo.com/news/15-biggest-companies-accept-bitcoin-165115491.html).

Moreover, Kais did not exchange BTC on the dark web and there are no allegations that Kais ever directly used the dark web in this case. While BTC and a variety of other items are exchanged on the dark web, Kais used public BTC exchange websites and met with people directly. His network of BTC kiosks ("BTM") were located in public places like shopping malls, gas stations, and convenience stores. All of the BTMs were easily accessible by the public and operated similarly to standard automated teller machines ("ATM"). The BTMs did not connect to the dark web and simply allowed individuals to convert currency into cryptocurrency and vice versa.

**C.     Not All of Kais's Customers Engaged in Illegal Activity.**

Kais recognizes that he was initially unregistered with FinCEN and that he continued not to follow the law even after registering. He also did not have an effective AML program, did not file currency transaction reports, did not conduct due diligence on customers, and did not file suspicious activity reports when necessary.

Notwithstanding these issues, the Government only points to one communication where a customer referenced the dark web to Kais. *See* Gov. Sentencing Position at 8:12-18. There is no evidence that Kais was routinely dealing with many customers who engaged in dark web activity. Additionally, in the communication referenced by the Government, there is no discussion about what that customer did on the dark web or whether that customer was telling the truth to Kais. It should also be noted that Kais never traded on the dark web, encouraged others to trade on the dark web, or encouraged dark web activity.

The evidence also does not establish that all of Kais's customers were engaged in illegal activity and that all of the funds he exchanged were the source of illegal activity. The Government acknowledges that the scope of the criminal conduct Kais enabled is unknown. *See* Gov. Sentencing Position at 11:4-6. Although this does not excuse Kais's conduct and it is recognized that Kais's unregistered status made the exchanges illegal, it is nonetheless mitigating information. This also differentiates Kais from the more serious unregistered money transmitters discussed below.

1

**D.     Kais Did Not Seek to Join the Undercover Agents in Illegal Activity.**

2

3

4

5

6

7

8

9

10

11

12

Kais engaged in multiple transactions with undercover agents from Homeland Security Investigations ("HSI").  He did not require the agents to identify themselves and did not file suspicious activity reports.  During one such transaction, an undercover agent told Kais that he worked at a "karaoke bar" that contained women from Korea who entertained men in various ways.  *See* Gov. Sentencing Position at 9:20-10:8.    Although Kais exchanged the funds provided by the agents for cryptocurrency, he did not ask to go to the "karaoke bar," he did not accept an invitation to go the "karaoke bar," he did not try to find the "karaoke bar" himself, and he did not express interest in participating in the alleged activities of the "karaoke bar."  The "karaoke bar" also did not exist and Kais exchanged far less than $100,000 in total with the undercover agents.

13

14

**E.     The Government's Sentencing Recommendation Imposes Too High a Consequence for the Conduct in this Case.**

15

16

17

18

19

The Government's recommendation of 46 months in custody is too high a price for Kais's behavior.  Kais is a nonviolent first-time offender who should be considered a low risk of reoffending.  Additionally, Kais is not a danger to others if he remains out of custody as he has demonstrated through his behavior while remaining under the supervision of pretrial services.  His case also involves no named victims and no fraud.

20

21

22

The Court should thus sentence Kais to probation or one year and one day of custody time.  Such a sentence would be fair in light of the totality of the facts in this case.

23

**i.     The Loss Range is the Majority of the Total Offense Level.**

24

25

26

27

The Total Offense Level in this case is dominated by the 20-level loss range enhancement.  *See* U.S.S.G. § 2B1.1(b)(1)(K); Doc. 31, PSR at ¶ 38.  This loss range does not adequately reflect the seriousness of Kais's offenses.    18 U.S.C. § 3553(a)(2)(A).  The Court should impose a reduced sentence.

28

**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION**

The loss range is based on the value of the exchange transactions Mr. Mohammad engaged in as an unlicensed money transmitting business.  It reflects that Mr. Mohammad exchanged more than $15,000,000 but no more than $25,000,000, from in-person exchanges and transactions at the BTMs.  This amount was also not pocketed by Kais as it represents the figure that passed through his business transactions.

There are no allegations that any of these transactions involved fraud, theft, or loss directly to customers.  There are no named victims.  The customers knowingly engaged in the transactions with Mr. Mohammad and agreed to pay above market commission rates.  Mr. Mohammad does not discount the seriousness of his offenses but the loss described in this case should not be treated like that derived from fraud or similar theft related activity.  As such, a noncustodial sentence of probation should be imposed.

> ### ii.     A Probationary Sentence Adequately Addresses Concerns of Punishment and Deterrence.

The Government states that Kais must be punished for his conduct and that the sentence must deter others from similar illegal activity.  These concerns can be addressed with the defense's sentencing recommendation.

Even without custody time, Kais will be significantly punished.  He is going to be forever branded a felon and, as a result, lose significant rights citizens of this country enjoy.  An individual's freedom is also substantially limited on supervised release or probation.  *See United States v. Ruff*, 535 F.3d 999, 1001, 1003 (9th Cir. 2008).  While custodial sentences are more severe than probationary sentences, the United States Supreme Court has emphasized that probationary sentences "…are quite oppressive given that probationers are subject to 'subject to several standard conditions that substantially restrict their liberty.'"  *Id.* at 1004 (quoting *Gall v. United States*, 552 U.S. 38, 47 (2007)).

1    Nonviolent financial crimes also do "…not pose the same danger to the

2    community as many other crimes." *See United States v. Whitehead*, 532 F.3d 991, 993

3    (9th Cir. 2008) (quoting the district court's finding) ("*Whitehead*").  For example, in

4    *Whitehead*, the Ninth Circuit found that a sentence of probation, community service,

5    and restitution was proper for a defendant who was convicted at trial of selling over

6    $1,000,000 worth of counterfeit "access cards" even though the United States

7    Sentencing Guidelines called for a sentence of 41 to 51 months in custody.  *See id.* at

8    992-93.  Like the defendant in *Whitehead*, Kais is charged with nonviolent crimes and

9    he poses little danger to the community.  *See id.*  Indeed, the Government tacitly

10   acknowledged this by not objecting to allowing Kais to remain free during the

11   pendency of this case and not immediately taking Kais into custody when he was first

12   contacted.  Kais has complied with all of the Court's orders and not had any issues

13   while remaining out of custody.

14       As for specific deterrence, Kais's lack of criminal history mitigates the

15   necessary term of imprisonment to deter him from future misconduct.  This case has

16   forever changed his life and Kais wants no further contact with the criminal justice

17   system.  The law enforcement contact, seriousness of the charges, the damage done to

18   his family, and all that he has lost, have all left Kais with feelings of remorse and a

19   desire to never again deviate from the values of honesty that were instilled in him

20   since childhood.  The defense's recommended sentence is not only adequate to deter

21   Kais, but it would also be consistent with other district courts' treatment of similar

22   crimes as discussed below.

23       Further, this case provides adequate deterrence for other nonviolent financial

24   crimes.  The amount that Kais has forfeited amounts to a significant level of

25   deterrence because people that engage in this type of criminal activity are driven by

26   the incentive to profit and make money.  The forfeiture serves as both a general

27   deterrent to others and a specific deterrent to Kais.  *See* 18 U.S.C. § 3553(a)(2)(B).

28   Accordingly, the Court should impose a probationary sentence.

- 7 -

**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION**

### iii.   Society Benefits from a Noncustodial Sentence.

Kais is a college graduate who has a long history of honest and legitimate employment.  He is also a man of positive character who looks after his family.  He has the capacity to continue to be a productive individual if a probationary sentence is imposed.  Society and the public at large benefit and are helped by productive individuals.  Productive individuals, like Kais, are the lifeblood and cornerstone of successful communities and societies.

Society will not benefit if a significant prison sentence is imposed because it will be left without an individual who can make significant and positive contributions.  Additionally, a significant custodial sentence will damage society because it will leave a family without their primary caregiver.  A probationary sentence is thus warranted in this case.

### iv.   The Government Does Not Adequately Consider the Mitigating Information.

The Government and defense agree that there is mitigating evidence and that this case warrants a sentence below the United States Sentencing Guidelines.  However, the Government does not properly account for the overwhelming mitigation in this matter.

Kais's family is dealing with extraordinary circumstances and the family will fall apart if he receives significant custodial time.  Kais's wife, Lubna Mohammad ("Lubna"), has been dealing with debilitating mental health and medical issues for years.  *See generally* Exs. A, B-1, D.  She is a fragile individual who cannot care for the couple's two minor children alone.  Lubna is barely holding on and it is not an exaggeration to say that if Kais is taken away from her, she will crumble.  The children's significant needs and medical issues will go unaddressed.  *See generally* Exs. A, B-1.  Such an outcome will stunt the young children's development and cause them to effectively lose both of their parents to this case.  The Government's recommendation does not adequately consider the overarching impact a lengthy

- 8 -

1    custodial sentence will have on the family.

2        Further, Kais has been dealing with a myriad of mental health and medical

3    issues that make custody a dangerous place for him.  *See generally* Ex. A.  COVID-19

4    has also made the federal prison system scary and unhealthy.  He should not be forced

5    into these conditions for a crime that contained no victims, no fraud, no theft, no

6    violence, and no restitution.  Kais should be placed on probation and allowed to

7    resume caring for his family.  This would be a just outcome that takes into account the

8    significant mitigating evidence in this case.

9        **v.**    **The Government's Sentencing Recommendation is Inconsistent with**

10             **Other Cases Involving Similar Charges.**

11       This Court must consider "…the need to avoid unwarranted sentence disparities

12   among defendants with similar records who have been found guilty of similar

13   conduct…"  *See* 18 U.S.C. § 3553(a)(6).  Sentences emanating from other cases shed

14   light on the types of sentences that other courts are ordering in similar cases.  The

15   same prosecutorial office involved in this case prosecuted all the cases discussed

16   below.  Further, these cases generally contain far more egregious conduct, direct drug

17   dealing, or dishonesty on the part of the defendants.

18       One of the major cases that should be considered is *United States v. Neman*,

19   Case Number 2:14-CR-00521-JAK ("*Neman*").  *Neman* involved a defendant who was

20   charged with 19 counts for engaging in a sophisticated structuring and tax fraud

21   scheme to hide the receipt of millions of dollars in illicit funds into his business.  *See*

22   *Neman* Gov. Sent. Position.  According to the Government's sentencing position,

23   Morad Nemen ("Mr. Nemen") and his co-defendants laundered narcotics proceeds

24   through their textile business.  To keep this secret, they kept records of cash they

25   received on a second, unofficial set of books, failed to file reports of cash received

26   over $10,000, structured the funds into a bank account they established in a different

27   name, and concealed this cash from their accounts so as to avoid paying taxes on this

28   income.  False tax returns were also filed.  When he was caught, Mr. Nemen attempted

1    to obstruct justice and evade responsibility for his crimes.  *See Neman* Gov. Sent.

2    Position.  In fact, he falsified tax returns after the indictment was unsealed.  *See*

3    *Neman* Gov. Sent. Position.  Because of the severity of the defendant's conduct, the

4    Government made a sentencing recommendation of 57 months.  *See Neman* Gov.

5    Sent. Position.  The District Court ultimately sentenced the defendant to 24 months for

6    trade based drug money laundering.  The conduct in *Neman* is far more severe than

7    that alleged against Kais.  Moreover, Kais immediately accepted responsibility and

8    stopped all criminal activity once contacted by the Government.

9          The sentence in *United States v. Kalra*, Case Number 2:19-CR-00484-PSG-1

10    ("*Kalra*") should also be examined.  The defendant, Kunal Kalra ("Mr. Kalra"), was

11    charged with four counts, including distribution of methamphetamine and operating an

12    unlicensed money transmitting business.  Mr. Kalra established bank accounts in the

13    names of others that allowed him to conceal his illicit business activities.  He also

14    admitted to operating a BTM that did not require customers to identify themselves.

15    Mr. Kalra further sold almost two pounds of methamphetamine to law enforcement

16    and exchanged a significant amount of cash for BTC.  He was ultimately sentenced to

17    18 months of custody time.  Unlike *Kalra*, Kais did not directly engage in any drug

18    transactions or open bank accounts under false names.  He also committed no fraud

19    and operated in public places without trying to conceal his activities.  Kais's conduct

20    is less egregious than that present in the *Kalra* case.

21          Another relevant case is *United States v. Tetley*, Case Number 2:17-CR-00738-

22    R ("*Tetley*").  The defendant in that case, Theresa Tetley ("Ms. Tetley"), was known

23    as the "Bitcoin Maven."  *See Tetley* Gov. Sent. Position.  She operated an unregistered

24    BTC-for-cash exchange service, which fueled a black-market financial system.  *See*

25    *Tetley* Gov. Sent. Position.  Ms. Tetley was not registered with FinCEN and operated

26    from 2014 to 2017.  *See Tetley* Gov. Sent. Position.  She exchanged between

27    $6,000,000 and $9,500,000.  *See Tetley* Gov. Sent. Position.  The Government

28    recommended 30 months of incarceration for Ms. Tetley.  *See Tetley* Gov. Sent.

- 10 -

**DEFENDANT KAIS MOHAMMAD'S REPLY TO THE GOVERNMENT'S SENTENCING POSITION**

Position.  She was sentenced 12 months and one day in custody.  *Tetley* is similar to Kais's situation.  Both involved unregistered BTC exchangers who made millions of dollars in transactions.  Like Kais, the Government alleged that Ms. Tetley charged a premium to customers seeking to avoid the regulated financial system and collected higher fees for services than regulated exchangers.  *See Tetley* Gov. Sent. Position.

All of the cases discussed resulted in sentences far below the Government's sentencing recommendation.  Additionally, *Neman* and *Kalra* involved serious levels of deception and narcotics transactions that are simply not present for Kais.  A sentence for Kais that is greater than the cases discussed above simply cannot be rationalized.  The Court should consider these cases and apply the applicable downward departures to avoid sentencing disparities.

### III.

### CONCLUSION

Based on the foregoing, Kais respectfully requests that the Court order a probationary sentence.

DATED:  May 14, 2021

GOLDSTEIN LAW GROUP

/s/
MICHAEL A. GOLDSTEIN
Attorney for Defendant
KAIS MOHAMMAD

THE KUYUMJIAN FIRM, APC

/s/
HAGOP KUYUMJIAN
Attorney for Defendant
KAIS MOHAMMAD

**PROOF OF SERVICE**

I am employed in the County of Los Angeles, State of California.  I am over the age of 18 and not a party to the within action; my business address is 515 S. Flower Street, Suite 1900, Los Angeles, California 90071. On May 14, 2021, I served the document described as:

**DEFENDANT KAIS MOHAMMAD'S REPLY TO**
**THE GOVERNMENT'S SENTENCING POSITION**

on the interested parties listed below in the manner described below:

**United States Probation and Pretrial Services, Central District of California**
Kathryn Herrera (served via e-mail to Kathryn_Herrera@cacp.uscourts.gov)
Christen Rudd (served via e-mail to Christen_Rudd@cacp.uscourts.gov)

**United States Attorney, Central District of California**
Ian Yanniello (served via CM/ECF system of Central District of California)

Executed on May 14, 2021 in Los Angeles County, California. I declare under the penalty of perjury under the laws of the United States that the above is true and correct to the best of my knowledge.

DATED:  May 14, 2021

THE KUYUMJIAN FIRM, APC
/s/
HAGOP KUYUMJIAN
Attorney for Defendant
KAIS MOHAMMAD